NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANK SUAREZ, | Hon. Faith S. Hochberg, U.S.D.J. |
| Plaintiff, | Civil Case No. 10-4495 (FSH) |
| v. | **OPINION & ORDER** |
| CITY OF BAYONNE, *et al.*, | Date: July 11, 2013 |
| Defendants. | |

**HOCHBERG, District Judge:**

This matter comes before the Court upon Defendants' Motion for Summary Judgment. [Docket No. 78]. Plaintiff Frank Suarez has brought suit against Defendants Detective Carey, Detective Rhodes, and the City of Bayonne. The Court has considered the motion and reviewed the submissions of the parties pursuant to Federal Rule of Civil Procedure 78.

**I.     BACKGROUND**

    **A. Statement of Facts**

This case arises from the arrest and subsequent detention of Suarez during the evening of April 29, 2010. At that time, Suarez was twenty-one years old and not employed. (Moving Br., Ex. D, at 10). Defendants Rhodes and Carey were both detectives in the narcotics bureau of the City of Bayonne Police Department. (Opp'n Br., Ex. S Tr. at 8; Ex. T Tr. at 8).

1

According to Suarez, he spent the morning of April 29, 2010, purchasing and then smoking marijuana and playing video games. (Moving Br., Ex. D, Tr. at 24:14-25:21). He spent the afternoon and early evening on East 11th Street in Bayonne. (*Id.*, Tr. at 26). That evening, Detective Rhodes was on duty when he received an anonymous phone call while he was eating dinner with Detective Carey and Detective Wayne Grapstul. The caller informed Detective Rhodes that there was a person engaging in narcotics transactions on East 11th Street, and provided an exact street address and a description of the person's clothing. (*Id.*, Ex. B., Tr. at 29-31).[1] According to Detective Rhodes, the three detectives continued eating their dinner until the anonymous caller placed a second call, and told Detective Rhodes to "hurry up, the person may leave." (*Id.*, Tr. at 31:10). Detectives Rhodes, Carey, and Grapstul then drove in a single car to the address the caller had given on East 11th Street. (*Id.*, Tr. at 31).

The parties dispute what occurred when the detectives arrived at East 11th Street. According to Suarez, he was sitting on some stairs when the detectives got out of the car and, without saying anything, "just came out swinging," hit him in the ribs, kicked him in the back, handcuffed him, and then continued to hit him. (Opp'n Br, Ex. P, Tr. at 29-32). Suarez stated that he did not run away or resist. As a result of the encounter, he claims that he suffered a scrape on the side of his head. (*Id.*, Tr. at 37:3-4).

Defendants present a different version of events. Detective Rhodes claims that when he arrived at East 11th Street, he recognized Suarez from his past encounters with the police. (Moving Br., Ex. B, Tr. at 32). The two men "locked eyes," and Suarez reached to his waist,

---

[1] Although Plaintiff disputes that this call took place, he provides no evidence to refute it. This is not sufficient. Suarez may not "withstand summary judgment by resting on mere allegations or denials in the pleadings." *United States v. 717 S. Woodward St.*, 2 F.3d 529, 533 (3d Cir. 1993).

2

dropped a bag of marijuana on the ground, and began running away. (*Id.* at 36). Detective Carey identified himself as a police officer, ran after Suarez, and tackled him. (*Id.* at Ex. C, Tr. at 33). Suarez resisted Detective Carey's attempts to handcuff him, but Suarez was eventually handcuffed. (*Id.* at 34-35). Suarez's brother, John Klumpp, testified that he saw Suarez lying on the ground, handcuffed, while Detectives Carey and Rhodes were kicking and punching him. (Moving Br., Ex. O., Tr. at 15). Suarez's mother testified that she saw him running from police, but lost sight of him when he fell behind some cars. (*Id.*, Ex. P).

It is not disputed that Suarez was eventually transported to police headquarters. While he was at police headquarters, Suarez was searched and placed in a holding cell. Approximately thirty to forty minutes later, he was brought to the narcotics office. (Opp'n Br., Ex. P, Tr. at 37). The parties agree that Suarez was then told by Detective Rhodes that he had to be searched a second time. According to Suarez, at the time of the second search, he was handcuffed with his hands behind his back. At the direction of the detectives, Suarez took off his pants and his shoes while still handcuffed. Suarez testified that Detective Rhodes punched him in the nose, and then both Rhodes and Detective Carey began hitting him and called him a derogatory name. (*Id.*, Tr. at 44-45). The defendants disagree with Suarez's account of the events. According to the detectives, when they tried to search Suarez a second time, Suarez was not handcuffed. Detective Rhodes argued with Suarez about whether he should be searched again. According to Detective Rhodes, the two men "exchanged words," and then "at some point [Suarez] pushed me, took a fighting stance, and kicked me in the genital areas." (Moving Br., Ex. B, Tr. at 59). Suarez was wearing boots. Detective Rhodes then struck Suarez once in the nose with a closed fist in self-defense. (*Id.*)

3

After suffering the injury to his nose, Suarez was transported by police to Bayonne Medical Center. Medical personnel diagnosed him with a non-displaced nasal fracture, and a skin abrasion on his arm. His medical records state that "no complaints offered by patient other than some mild nasal discomfort." (*Id.*, Ex. J at 4). He was discharged back into the custody of police that evening after an exam by medical personnel and being given Ibuprofen. (*Id.* at 7).

Suarez was charged with aggravated assault on a police officer, resisting arrest, obstruction of justice, and possession of marijuana. (*Id.* at Ex. M). On July 12, 2010, Suarez mailed a complaint to the Internal Affairs Unit of the Bayonne Police Department alleging "Detectives Carey and Rhodes handcuffed him behind his back, pulled his pants down and Detective Rhodes struck him three times in the nose and Detective Cary struck him twice in the face." (*Id.*, Ex. G at 2). The Internal Affairs Unit investigated this complaint, and deemed it exonerated.[2]

### B. Procedural History

On September 1, 2010, Suarez filed a three-count complaint in this Court. Suarez brought claims under 42 U.S.C. § 1983 on the grounds that Defendants had violated his rights "against unreasonable seizure of his person," "against the use of unreasonable, unnecessary, and excessive force," and "to medical care for injuries received while in custody." (Compl. at 3-4). He sought $2.5 million in damages. (*Id.*) On March 14, 2012, this Court stayed the case pending the outcome of the criminal case against Suarez. [Docket No. 65]. In December of 2012, Suarez pled guilty in New Jersey municipal court to simple assault on Detective Rhodes. The remainder of the charges against him were dismissed pursuant to the plea deal. [Moving

---

[2] The investigation included reviewing the reports filed concerning the incident, relevant radio transmissions and logs and interviews with Detectives Rhodes and Carey. Suarez did not appear for his scheduled interview with the Internal Affairs Bureau. (Moving Br., Ex. G).

Br., Ex. S]. The Court then lifted the stay. [Docket No. 73]. This motion for summary judgment followed.[3]

## II. DISCUSSION

### A. Standard of Review

Pursuant to Fed. R. Civ. P. 56(c), a motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, "[s]ummary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988). All facts and inferences must be construed in the light most favorable to the non-moving party. *Peters v. Delaware River Port Auth.*, 16 F.3d 1346, 1349 (3d Cir. 1994). The judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. "Consequently, the court must ask whether, on the summary judgment record, reasonable jurors could find facts that demonstrated, by a preponderance of the evidence, that the nonmoving party is entitled to a verdict." *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 860 (3d Cir. 1990).

---

[3] Defendants have also requested that this Court dismiss part of the Complaint pursuant to Federal Rule of Civil Procedure 12(c). As Plaintiff correctly argues, dismissal under Rule 12(c) is only appropriate if the motion is submitted "early enough not to delay trial." At this stage of litigation – in which discovery has been completed, and a trial has been scheduled – to grant Defendants' motion under Rule 12(c) would significantly delay the trial. Therefore, the Court will not entertain the motion.

The party seeking summary judgment always bears the initial burden of production. *Celotex Corp.*, 477 U.S. at 323. This burden requires the moving party to establish either that there is no genuine issue of material fact and that the moving party must prevail as a matter of law, or to demonstrate that the nonmoving party has not shown the requisite facts relating to an essential element of an issue on which it bears the burden. *Id.* at 322-23. Once the party seeking summary judgment has carried this initial burden, the burden shifts to the nonmoving party.

To avoid summary judgment, the nonmoving party must then demonstrate facts supporting each element for which it bears the burden, and it must establish the existence of a "genuine issue of material fact" justifying trial. *Miller*, 843 F.2d at 143; *accord Celotex Corp.*, 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Further, summary judgment may be granted if the nonmoving party's "evidence is merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249-50.

**B. The Claims for Excessive Force and Unreasonable Seizure**

Plaintiff alleges that Detectives Rhodes and Carey – without any provocation or warning – jumped of out of their car and began kicking and punching him during his arrest on East 11th Street. Plaintiff also alleges that once he arrived at the police station, Detectives Rhodes and Carey again began punching and kicking him without provocation, and that he suffered a nasal fracture as a result. Based on his arrest on East 11th Street, and the events at police headquarters,

6

Plaintiff brings § 1983 claims for excessive force and unreasonable seizure. Plaintiff pled guilty in New Jersey state court to simple assault on Detective Rhodes.

Defendants argue that the Court should dismiss these claims under the doctrine laid out in out in *Heck v. Humphrey*, 512 U.S. 477 (1994). Under the *Heck* doctrine, this Court must dismiss a § 1983 claim if finding in favor of the plaintiff would "necessarily imply the invalidity of a prior criminal conviction." *Lora-Pena v. FBI*, 529 F.3d 503, 505 (3d Cir. 2008). A conviction for resisting arrest or simple assault on an officer does not necessarily bar a § 1983 complaint for excessive force. *Nelson v. Jashurek*, 109 F.3d 142 (3d Cir. 1997). However, in this case, Plaintiff's guilty plea to simple assault directly conflicts with his claim before this Court that he did not kick Detective Rhodes, and that his nose was fractured during an unprovoked attack by Detectives Rhodes and Carey. (Moving Br. at 26). If this Court were to credit Suarez's testimony that he did not strike Detective Rhodes, this would imply his guilty plea to simple assault was invalid. The *Heck* doctrine obviates such an outcome.[4] *See Whaley v. Borough of Collingswood*, No. 10-4343, 2012 U.S. Dist. LEXIS 84706 at *17-*18 (D.N.J. June 18, 2012). While Plaintiff did not plead guilty to resisting arrest, obstruction of justice, or

---

[4] Plaintiff argues that he entered his plea subject to New Jersey Court Rule 3:9-2, which provides that "[o]n the request of the defendant, the court may, at the time of the acceptance of a guilty plea, order that the plea shall not be evidential in any civil proceeding." Plaintiff requests that this Court strike all references to his guilty plea and argues the Court is barred from considering his plea pursuant to that Rule. (Opp'n Br. at 32-33). That New Jersey Court Rule does not make the *Heck* doctrine inapplicable. *Hurt v. Atlantic City*, No. 08-3053, 2010 U.S. Dist. LEXIS 16383 at *16 n. 13 (D.N.J. Feb. 24, 2010). This is because *Heck* "is not an evidentiary doctrine regarding the use of criminal convictions to establish facts," but rather provides that "a claim that necessarily challenges an underlying conviction is not cognizable under § 1983." (*Id*). While Suarez pled guilty subject to a civil reservation, this Court cannot ignore his conviction for simple assault when deciding the motion for summary judgment.

The Court does not ignore Plaintiff's guilty plea and plea colloquy necessary to establish guilt for simple assault on Detective Rhodes. The sham affidavit doctrine states that "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004).

7

possession of marijuana, those claims were dismissed pursuant to a plea deal to which he did enter a guilty plea. (Moving Br., Ex. T).

Plaintiff's other claims regarding the scuffle at police headquarters are clearly barred by *Heck*, as are his claims regarding the police action at East 11th Street, which began the chain of events leading to his guilty plea for simple assault on Detective Rhodes. Moreover, even if *Heck* were not applicable to actions of Detectives Rhodes and Carey at East 11th Street, no reasonable fact-finder could decide in favor of Plaintiff on those claims. Detectives Rhodes and Carey have provided deposition testimony that they arrested Suarez after he fled from them, and that he resisted arrest. While Plaintiff denies that he ran from police or was engaged in any illegal activity at the time of his arrest, the sworn testimony of his own mother contradict this factual allegation because she testified that she saw him running away from the police officers.[5] Suarez also alleges that the police punched and kicked him without any cause whatsoever, but his only injury from the East 11th Street encounter was a scratch on his head. Suarez also provides his internal affairs complaint, but in that document he said only that the police threw him to the ground when they arrested him, which they certainly can do when a suspect is running from them. (Moving Br., Ex. H). Most significantly, Suarez never even bothered to show up at his internal affairs interview, rendering his internal affairs complaint a merely untested self-serving statement. Under these circumstances, no rational trier of fact could find for the plaintiff. *Matsushita Elec. Indus. Co*, 475 U.S. at 586.

Finally, Defendants also argue that Plaintiff's claims for excessive force and unreasonable seizure are barred by the doctrine of qualified immunity. Under the doctrine of qualified immunity, the Court must first determine whether there was a constitutional violation.

---

[5] Suarez's brother also testified that he was told Suarez was running from police at the time of his arrest.

If so, the Court must inquire into whether the right was clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). Plaintiff has alleged that the individual defendants were acting outside of the scope of their authority when they approached him, as there was no probable cause, search warrant, arrest warrant, or observation of illegal activity. (Opp'n Br. at 21). The individual defendants have established that they are entitled to qualified immunity on this claim. Detectives Rhodes and Carey have testified that they approached Suarez based upon a tip from an anonymous source that he was participating in drug transactions, and they arrested him after he fled while discarding a plastic bag with possible narcotics inside. Although Suarez argues that "[t]hese types of anonymous tipsters have no credibility, and do not suffice to give probable cause," as Defendants properly argue, the qualified immunity analysis "must be conducted in light of the facts that were available to the officer." *Curley v. Klem*, 499 F.3d 199, 207 (3d Cir. 2007). In this case, under the circumstances, the bona fides of the anonymous tipster would not have been known to Detectives Rhodes and Carey when they decided to approach Suarez. While Suarez' guilty plea ended the criminal case, and thus neither side could test the initial basis for the drug investigation that began this chain of events, nothing in the tipster's calls renders the individual officers liable for violation of any clearly established constitutional right.

### C. The Claim for Failure to Provide Medical Treatment

Plaintiff also brings a claim for failure to provide medical treatment. In support of his claim, he alleges that his injuries sustained on East 11th Street were sufficient to warrant a need for medical attention. He also alleges that Defendants waited almost an hour to take him to the hospital after the injury to his nose. (Opp'n Br. at 25).

9

In order to prevail on a claim for failure to provide medical treatment under § 1983, a plaintiff must demonstrate "(i) a serious medical need, and (ii) acts or omissions . . . that indicate deliberate indifference to that need." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). In order to make a showing of deliberate indifference, there must be evidence that Defendants knew of and disregarded an "excessive risk" to Suarez's health. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). "Only 'unnecessary and wanton infliction of pain' or 'deliberate indifference to the serious medical needs" of prisoners are sufficiently egregious to rise to the level of a constitutional violation." *White v. Napoleon*, 897 F.2d 103, 108-09 (3d Cir. 1990) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

Defendants are entitled to summary judgment on this claim. With respect to his injury at East 11th Street, Suarez alleges that his head was scratched during his arrest. He does not allege that he asked for medical attention, or that this injury amounted to a serious medical need. Accepting his allegations as true, this is not sufficient to meet the standard laid out in *Rouse* and *Natale*. With respect to Suarez's injury in the Bayonne Police Headquarters, he was taken to the hospital shortly after he suffered the injury to his nose. The records in evidence indicate that Suarez was arrested at approximately 6:00 p.m., and admitted to Bayonne Medical Center at approximately 7:00 p.m. In the intervening hour, Suarez has testified that he was waiting in a holding cell for about half an hour before the incident with Detective Rhodes. Crediting Suarez's testimony, at most half an hour elapsed before he was taken to the hospital after he was injured in the station during the scuffle that led to his guilty plea. No reasonable fact-finder could find a failure to provide medical treatment.

**D. City of Bayonne**

Finally, Defendants ask the Court to dismiss Suarez's complaint against the City of Bayonne for "failing to adequately supervise, discipline, investigate or train." (Compl. at ¶ 10). According to Defendants, Suarez has neither alleged nor provided any proof that would give rise to liability on the part of Bayonne.

"'When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom.'" *Mulholland v. Gov't Cnty. of Berks*, 706 F.3d 227, 237 (3d Cir. 2013) (quoting *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)). Therefore, Bayonne may only be held liable under § 1983 "when the injury inflicted is permitted under its adopted policy or custom." In this case, because the Court finds there was no constitutional violation, Bayonne may not be held liable under a theory of municipal liability. *See, e.g.*, *Estate of Smith v. Marasco*, 318 F.3d 497, 505 (3d Cir. 2003).

Moreover, Suarez has adduced absolutely no evidence beyond mere legal conclusory language that Bayonne could be held liable. Suarez alleges that the Bayonne Police failed to sufficiently investigate the incident but he refused to cooperate and be interviewed. He also cites other civil suits filed against Bayonne, noting neither Detectives Carey nor Rhodes had ever been disciplined or punished regarding those cases.[6] With nothing more than this, Plaintiff states: "[i]t has long been the custom and policy . . . that the City of Bayonne Police Department have allowed several Officers to head bang citizens without recourse." (Opp'n Br. at 31).

---

[6] With the absurd amount of damages sought for a scratch during an arrest mid-flight and a nose injury obtained while assaulting a police officer, this spate of civil suits is not surprising. Nothing is adduced about the merits of those suits nor the proven actions of the particular officers in this case, if any, in those other cases.

In their depositions, Detectives Carey and Rhodes testified that they received training twice a year on excessive force under the New Jersey Attorney General Guidelines. Although Plaintiff has noted that other civil suits have been filed against the City of Bayonne and Detectives Rhodes and Carey, merely providing the names and docket numbers of those cases is not remotely equivalent to evidence that Bayonne permits constitutional violations as a policy or custom. *Mulholland*, 706 F.3d at 237. Additionally, although Suarez alleges that the Bayonne Police Department failed to adequately investigate this complaint, the record reflects (and Suarez did not deny) that he did not attend an interview with the investigating internal affairs officer. That officer did conduct interviews with Detectives Cary and Rhodes, and reviewed other relevant evidence. There is no genuine issue for trial on this claim. *See Anderson*, 477 U.S. at 249.

### III. CONCLUSION

For the reasons stated above,

**IT IS** on this 11th day of July, 2013,

**ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of the Court is to close this case.

/s/ **Faith S. Hochberg**_____
Hon. Faith S. Hochberg, U.S.D.J.